**FILED**

OCT 2 8 2022

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY _____ DEP CLK

# UNITED STATES DISTRICT COURT
for the
Eastern District of North Carolina

| | |
|---|---|
| United States of America<br>v.<br>Ivan Leonardo MEDINA-BELTRAN,<br>Xavier GARZA<br><br>*Defendant(s)* | )<br>)<br>)  Case No. 4:22-MJ-1165-BM<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  September 8, 2022  in the county of  Craven  in the Eastern District of  North Carolina , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(B) | Distribution of 50 grams or more of methamphetamine (mixture) |

This criminal complaint is based on these facts:

See attached Affidavit of DEA SA Carolyn Handy

☑ Continued on the attached sheet.

*Carolyn Handy*
Complainant's signature

SA Carolyn Handy, DEA
*Printed name and title*

Subscribed and sworn to in accordance with Fed. R. Crim. P. 4.1
via telephone.

Date: October 28, 2022; 3:52 pm

City and state:  Raleigh, NC 

*Judge's signature*

Hon. Brian S. Meyers, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT FOR CRIMINAL COMPLAINT

# (FILED UNDER SEAL)

I, Carolyn Handy, being first duly sworn, depose and state under oath as follows:

## INTRODUCTION

1. I make this affidavit in support of a criminal complaint charging Ivan Leonardo MEDINA-BELTRAN and Xavier GARZA with violations of 21 U.S.C. 841(a)(1) & 841(b)(1)(B) – distribution of 50 grams or more of a mixture and substance containing a detectable amount of methamphetamine.

2. I am a Special Agent with the Drug Enforcement Administration (DEA), assigned to the Wilmington, North Carolina Resident Office (WRO), and have been so employed since May of 2021. As such, I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516(1) and Title 21, United States Code.

3. In my capacity as a DEA Special Agent, I investigate violations of the Controlled Substances Act (Title 21, United States Code, Section 801, et seq.). Prior to joining the DEA, I completed Basic Law Enforcement Training through the Coastal Carolina Community College while employed by the Jacksonville, North Carolina Police Department (JPD) from January 2017 through May 2017, completing over 700 hours of training. This training included classes on controlled substance law; methods of how controlled substances are bought, sold, packaged, and distributed;

criminal investigations; and interview techniques. After completing Basic Law Enforcement Training, I served with JPD as a police officer and investigator for four years (until January of 2021). I have completed the 16 week-long DEA Basic Agent Training Course which included the topics of drug identification, confidential source management, surveillance, interview and interrogation, search warrants, undercover operations, and others. The DEA Basic Agent Training Course also included legal training, to include a review of the Controlled Substances Act, 4th Amendment/search and seizure law, asset forfeiture procedures, and the law pertaining to electronic surveillance, among other topics.

4. In total, I have over five (5) years of law enforcement experience. I have attended and completed numerous training courses related to gangs, drug trafficking investigations, drug identification, and drug interdiction. I have received both formal and informal training regarding the different methods of drug trafficking and money laundering.

5. In connection with my official DEA and prior law enforcement duties, I have initiated and participated in numerous narcotics investigations at the local and federal level, to include several long-term drug trafficking investigations with other federal and local law enforcement agencies. During the course of these previous narcotics investigations, I have personally participated in physical surveillance, electronic surveillance, undercover operations, and executions of search warrants. I have directed and participated in investigations of criminal violations of federal and state-controlled substance laws, including, but not limited to, Title 21, United States

Code, Sections 841, 843, 846, 848, 952, 960, 963, and Title 18, United States Code, 924, 1965, 1957, and 371, as well as the aiding and abetting of the above offenses.

6. I have participated in the debriefing of defendants, witnesses, and informants, during which time I have discussed with them their methods of drug smuggling, distribution, packaging, trafficking, avoiding law enforcement, and laundering drug proceeds related to drug trafficking. I have also discussed these same matters with experienced law enforcement investigators who specialize in illegal drug trafficking. As a result of my training and experience, I have become familiar with methods that drug traffickers and drug trafficking organizations use to distribute heroin, cocaine, cocaine base, commonly referred to as "crack" cocaine, methamphetamine, marijuana, and other controlled substances.

7. Through my involvement in several federal Title III investigations, I have gained experience in investigations involving the interception of wire and electronic communications and have learned that drug traffickers often speak in guarded or coded language when discussing their illegal business in an effort to further prevent detection. I have been directly involved in the review and deciphering of intercepted coded conversations between narcotics traffickers that were later corroborated by surveillance. Throughout my law enforcement career, I have spoken with, worked with, and gained knowledge from numerous experienced federal, state, and local narcotics officers about drug traffickers and their use of cellular telephones to facilitate drug trafficking by, for example, using code during their conversations.

I have also received extensive instruction and practical training on intercepting communications and conducting coordinated surveillance while at the DEA Academy.

8. Based upon my training and experience, as well as these prior investigations, I have learned that cellular telephones provide illegal narcotics traffickers with mobile access and control over their illegal trade. I have also learned that drug traffickers often utilize cellular telephones to communicate with one another in furtherance of their illegal narcotic activities both via voice and text message communications. I also know that illegal narcotics traffickers routinely utilize false information when registering their cellular telephones and utilize cellular telephone numbers and cellular telephones for short periods of time. I have also conducted investigations involving the identification of co-conspirators through the use of telephone records and bills, financial records, drug ledgers, photographs, and other documents.

9. I have directed confidential informants and cooperating witnesses to successfully infiltrate various-sized narcotics enterprises by way of intelligence gathering, participation in consensual recordings, and monitored purchases of controlled substances. I have executed search warrants for controlled substances-related documents and have conducted surveillance in connection with numerous narcotic investigations. My training and experience as a Police Officer with the Jacksonville Police Department and as a Special Agent with the DEA, along with conversations with other Federal, state and local investigators familiar with narcotics

trafficking and money laundering matters, form the basis of the opinions and conclusions set forth below, which I drew from the facts set forth herein.

## PROBABLE CAUSE

10. This affidavit is based upon my own personal knowledge as well as information supplied by other law enforcement officers, surveillance, and reviewing law enforcement reports, search warrant, and debriefs. I am not including every fact of the investigation, but only the necessary information needed to obtain probable cause.

11. On September 8, 2022, investigators utilized a confidential source (CS1)[1] to arrange and conduct a controlled purchase of 10 ounces of methamphetamine from Xavier GARZA at 72 Woods Run in New Bern, North Carolina. CS1 and CS1's vehicle were searched before and after the meeting for drugs, money, weapons, or other contraband. CS1 was also equipped with a covert video and audio recording device and closely monitored by investigators before, during, and after the meeting. Investigators also conducted surveillance of the outside of 72 Woods Run during the transaction.

---

[1] CS1 began working as a confidential source for the New Bern Police Department after investigators seized narcotics from CS1 on January 3, 2022. CS1 is cooperating in order to receive consideration for his/her pending drug charges, and also began to receive financial compensation for his/her time and efforts while cooperating. CS1 has conducted several controlled purchases and has provided detailed information on other targets of the investigation that investigators have independently corroborated. Investigators believe that CS1 has proven to be reliable. CS1 has prior convictions for attempted breaking/entering (1998), possession of drug paraphernalia (2001), possession with intent to sell/deliver marijuana (2003), sell/deliver marijuana (2003), assault government official/employee (2003), possession of a firearm by a felon (2003), felony possession of cocaine (2009), and assault government official/employee (2010).

12. While CS1 was driving to meet GARZA, CS1 placed a phone call to a phone that is subscribed to GARZA. During the phone call, GARZA instructed CS1 to come to his residence at Woods Run.

12. When CS1 arrived at 72 Woods Run, investigators saw one of GARZA's vehicles parked near the residence. Once CS1 arrived, GARZA told CSI that he had to wait on "Gordo," known to investigators to be Leonardo Ivan MEDINA-BELTRAN, to bring the methamphetamine. While in the presence of CS1, GARZA used his phone to call MEDINA-BELTRAN to have him bring the drugs for CS1. The covert video/audio recording device captured part of GARZA's phone call with MEDINA-BELTRAN. GARZA indicated that did not want CS1 to wait too long, and appeared to be trying to hurry MEDINA-BELTRAN.

13. Investigators conducting surveillance watched a gold Toyota Avalon arrive at 72 Woods Run. Investigators had previously seen MEDINA-BELTRAN drive the same gold Toyota Avalon.

14. On CS1's video recording device, investigators saw MEDINA-BELTRAN walk inside the residence at 72 Woods Run with a plastic bag. GARZA commented that MEDINA-BELTRAN had entire pound of methamphetamine. GARZA indicated that he and GORDO needed a functioning digital scale to weigh out the 10 ounces for CS1. GARZA told CS1 that the scale that GARZA had at the residence was not working, and that GARZA needed to get a scale to properly weigh out the drugs for CS1. GARZA told CS1 that he had a scale at a nearby location. GARZA was seen on the video leaving 72 Woods Run to and returning a short time

later with the scale. GARZA and MEDINA-BELTRAN weighed out the approximate 10 ounces of methamphetamine. While preparing CS1's drugs for sale, GARZA told CS1 that 72 Woods Run was just one of his "trap houses." I know based on my training experience that a "trap house" is a term for a location used to store controlled substances. CS1 paid GARZA and MEDINA-BELTRAN for the drugs with $5,000 in official, pre-recorded funds. MEDINA-BELTRAN then counted the official, pre-recorded funds that CS1 gave him, and gave CS1 the drugs that he and GARZA had weighed out.

15. Following the transaction, investigators surveilled CS1 leaving the residence and met CS1 at the predetermined meet location. CS1 provided the ten ounces (approximately 280 grams) of suspected methamphetamine to investigators. CS1 also confirmed to investigators of what was seen through the video recording device. The substance field tested positive for the presence of methamphetamine.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

16. Based upon the foregoing, I respectfully request that a criminal complaint and arrest warrant be issued for MEDINA-BELTRAN and GARZA for violations of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), distribution of 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine.

Respectfully submitted,

*Carolyn Handy*
Carolyn E. Handy
Special Agent
Drug Enforcement Administration

Subscribed and sworn to in accordance with Fed. R. Crim. P. 4.1 on this 28th day of October, 2022. via telephone at 3:52pm.

HON. BRIAN S. MEYERS
UNITED STATES MAGISTRATE JUDGE